SULLIVAN ET AL. *v.* CASSIDY.

458

(Decided May 31, 1927.)

*Messrs. Freiberg, Avery & Simmonds,* for plaintiffs in error.

*Messrs. Kunkel & Kunkel,* for defendant in error.

Cushing, J. Patrick Sullivan, aged about 80 years, on August 29, 1924, signed a paper purporting to be his last will and testament. He died October 8, 1924. The will was probated July 2, 1925. Mary Cassidy, his daughter, filed an action in the court of common pleas pleading that such paper writing was not the last will and testament of Patrick Sullivan, deceased.

The issue was made by journal entry as to whether or not the paper writing was the last will and testament of Patrick Sullivan.

Much evidence was introduced with respect to the mental capacity of Patrick Sullivan, and with regard to whether he was unduly influenced to make the will in question.

The verdict was that the paper writing was not the valid last will and testament of Patrick Sullivan. Judgment was entered on the verdict. This action is prosecuted to reverse that judgment.

The errors assigned are: The overruling of defendants' motion, at the conclusion of plaintiff's testimony, for an instructed verdict on the ground that there was no evidence that the deceased did not have mental capacity to make a will or that he was unduly influenced to make the will in question; that the verdict was not sustained by sufficient evidence; that the trial court erred in limiting the plaintiffs in error in the cross-examination of one of defendant in error's witnesses; error in the refusal of the court to admit in evidence the testimony given in a certain lawsuit before a justice of the peace in 1899; errors of law occurring at the trial; and error in the general charge of the court.

In a will contest, the jury may consider the age,

the mental and physical condition of the testator at the time of executing the will, his habits and associations, his relations to the parties interested, his affections toward them, their claims upon his bounty, the character and extent of his property, and the disposition he made of it. *Collins* v. *Collins*, 110 Ohio St., 105, 143 N. E., 561, 38 A. L. R., 230.

The contestant's evidence was that the testator was about 80 years of age; that two years prior to his death he had pneumonia, and was critically ill; that his eyesight began to fail about 1918, and for a year or so prior to making the will he was practically blind, and could not read except with a strong magnifying glass; that in 1922 John Sullivan wrote his sister about their father's physical condition and eyesight, stating "his once active mind is beginning to fad [fade]," and that his impaired vision was such that he could not make a journey.

John Sullivan testified that his father requested him to arrange with a lawyer to draw a will; that he interviewed the lawyer, gave his father a list of his property, its location and its value; that he took this memoranda and a former will to the lawyer, who drew a draft of a will, which he took to his father. There is no statement in the record as to when the will was drawn, who was present, whether Patrick Sullivan read the will, or who, if any one, read it to him. On the day it was executed John Sullivan went to 502 West Eighth street, where his father was living, and accompanied him to the lawyer's office. In the suite of offices there were three men and a stenographer. When the Sullivans arrived, the deceased went into the lawyer's private office; John Sullivan remained in the outer office.

After the lapse of an hour and a half to two hours the deceased emerged from the private office. He and his son left together and separated at the entrance to the building. There is no evidence of what was said or done in that office, other than that the will was signed, and names signed to the attesting clause.

The 1918 will is in evidence. It gave to Mrs. Cassidy one-third of the estate for her life. The testator executed seven or eight wills after 1910. Their provisions were different. He had numerous controversies with his children. At one time Mrs. Cassidy made a trip from her home in New York and persuaded her father to change his attitude toward her brother Will.

About three years prior to the execution of the will in question, Mrs. Cassidy came to Cincinnati, at the request of the family, and, at the suggestion of Will, had a conversation with her father. He said:

" 'Now William and John have been talking it over with me, and they want—and they think it is best for you to have your share of the estate now, Mollie.' * * * And I said, 'What is it, Pa, what do you mean by that?' And he said, 'Well, they think it is better for you to sign away your share of the estate now and for me to give you $10,000 cash, would you like to have it, Mollie?' "

She testified that when she was leaving for her home the following conversation took place:

"Then he asked me how I would like to have $10,000 and, after he had said that Will and John had been talking it over with him and they felt it would be best for me to have my share of the es-

tate now if I would sign the paper; and I said—then he asked me how I felt about it. And I said—he said, 'Would you like to have the $10,000, Mollie, cash?' And I said, 'Why, Pa, I certainly would like to have it, but aren't you joking?' And he said, 'No; I mean it now, would you like to have the $10,000 cash?' And I said, 'I certainly would, Pa.' 'Well,' he said, 'all you have to do if you want that $10,000 now is to sign the paper and the money is yours.' And I said, 'Well, Pa, I don't think that is fair now, just because Will and John ask you to have me sign away my share of the estate for $10,000. Now I won't consent to it.' ''

He then requested her not to worry about it, and added: ''John and Will won't give me any peace until you sign that paper.''

Patrick Sullivan's shoe business was incorporated in 1919. Its value was variously estimated at from about $254,000 to something over $800,000. John and Will Sullivan drew from it in salaries and commissions sums in different years from $16,000 to $35,000. John and Will Sullivan got the entire shoe business from their father in the latter part of 1919. In October, 1922, when Patrick Sullivan was seriously ill with pneumonia, John and Will Sullivan received from him sums of money aggregating between twenty and thirty thousand dollars. They had their father sign a check in blank a day or two preceding his death. It was filled out, and more than $16,000 was drawn by them on the day he died.

The contestant, at different intervals, received from her father $50 to $100 per month; the total sum she received would not exceed $5,000. Under

the will in question, she was to receive $1,500 per year during her life.

The circumstances surrounding the making of the will, the absence of evidence as to what was said and done at that time, the number of wills signed giving the daughter from a third of the estate down to an income from $25,000, the fact that he was sick, feeble, almost blind, and was living in one room downtown, away from his relatives, that the daughter was not notified of his condition, or that he was seriously ill, until after his death, are all evidence from which a jury could conclude that the paper writing in question was not his last will and testament.

The contestees' evidence portrays Patrick Sullivan a strong, vigorous, and alert young man learning and working at a trade, starting a business, and developing it to success; as the years passed, a family coming to him, the boys working and remaining with him at home, and in the business, the daughter, contrary to her promise to him, marrying against his wishes and going to New York to live. It sets forth that on one occasion, when her father went to visit her, her husband mistreated him, spat in his face, and closed and barred the door, so that he could not enter their home.

In the numerous wills that he made, different provisions were made for the daughter. Her visits to him were infrequent. At one time, her husband filed an action against her father, and she testified against him.

Many witnesses, thirty or more, business and professional men, testified to Patrick Sullivan's mental capacity; that in their opinion it was good.

This evidence covered a period of many years, and some of it a period within a few months of the date of making the will in question here.

Patrick Sullivan often stated that his son-in-law should never have an opportunity to spend any of his money.

This evidence, together with the fact that in different wills the daughter was given one-third of the estate for her life, and in others an income from specified amounts, is evidence from which a jury might have determined that said paper writing was his last will and testament.

The evidence and circumstances are in direct conflict. The jury is the only arbiter known to our law that could determine the question; and, unless it is shown that the verdict was not supported by sufficient evidence, this court would not be justified in setting it aside.

Two of the errors assigned, the overruling of the motion for an instructed verdict, and the overruling of the motion for a new trial on the weight of the evidence, are not tenable.

Another error assigned is the refusal of the trial court to allow the attorneys for contestees to cross-examine John Sullivan, a witness called by the contestant. They cite and rely on the case of *Legg* v. *Drake,* 1 Ohio St., 286, as an authority that the court erred in so ruling. There was no affirmative defense, nor could there be such in a will contest. The sustaining of the objection to the question asked when John Sullivan was on the witness stand would be prejudicial error if it were not for the fact that John Sullivan later, in his examination, answered a

similar question and other witnesses also testified to the same facts.

It is claimed that the trial court erred in its charge to the jury, in that certain witnesses were permitted to testify as to statements made by the testator, and that the court did not limit the jury in its consideration of this evidence to the one purpose of showing the state of mind of the testator.

Counsel admit and state that the evidence of which they complain was admissible to show the state of mind of the testator. A general objection'was interposed, and we have been directed to but one statement by counsel that the testimony should be admitted only for the purpose stated. They call our attention to page 180 of the record. Beginning at the bottom of page 178, we find that counsel for plaintiffs in error, in cross examining John Sullivan, one of their clients, interrogated him with reference to certain conversations with his father relative to the relations existing between the father and daughter and son-in-law. No objection was interposed.

On page 180 is the following:

"Mr. Simmonds: Is your honor sustaining it on the ground it is hearsay. We reserve an exception upon the ground that all conversations of Patrick Sullivan are competent in evidence as tending to show his state of mind and likewise his friendliness or unfriendliness with his daughter."

Counsel for plaintiffs in error in their brief state:

"It is true that Wigmore favors the admission of such declarations for the purpose of showing state of mind, and for that reason, under the Ohio cases, we did not object to the question at the time of the trial."

They then claim that the jury should have been instructed as to the purpose for which such testimony was admitted.

It was not error to admit the testimony over a general objection, and counsel did not request the court to limit the jury's consideration of it. At page 539 of the record we find: Counsel for plaintiffs in error had requested the court to put its charge in writing. At the conclusion of the testimony, the court, having put its charge in writing, and given a copy to counsel, stated that he was going to add a paragraph to the charge. Counsel then said:

"Mr. Simmonds: Your honor will allow defendant a specific exception to the refusal of the charge to limit the admissibility of plaintiff's exhibits and testimony as to sayings and writing of the testator to the same effect, namely, as bearing on the state of mind of the testator."

The request is for a specific exception to what is suggested to be a refusal to charge on a proposition that is not disclosed in the record. The record does not disclose any request for the charge suggested, nor a refusal to give such a charge, other than the wording of the request for a specific exception. If such a request was made, we do not know what matter it contained, or what form it took, or why it was refused, if it was refused.

Moreover, the request for the exception takes on the form of passing on evidence as to its limitation, after the case was closed, in so far as the evidence was concerned, and regarding evidence which was admissible. The objection in the request, if it may be considered as such, comes too late.

For the reasons herein stated, our conclusion is

that there was no error prejudicial to the plaintiffs in error, and we adhere to our former decision affirming the judgment of the court of common pleas.

*Application for rehearing denied.*

HAMILTON, P. J., and BUCHWALTER, J., concur.